**IN THE UNITED STATES DISTRICT COURT  
FOR THE NORTHERN DISTRICT OF IOWA  
EASTERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DONALD J. HERBST, Sr.,

    Defendant.

No. 10-CR-1008-LRR

**ORDER**

_____

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*
*II.*    *RELEVANT PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . *2*
*III.*   *TRIAL EVIDENCE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
     *A.*     *Defendant* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
     *B.*     *Law Enforcement Discovers the Pattersons' Scheme.* . . . . . . . . . . . *2*
     *C.*     *Civil Settlement and Forfeiture* . . . . . . . . . . . . . . . . . . . . . . . *4*
     *D.*     *Robert McQuillen* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
*IV.*   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
     *A.*     *First Disputed Statement* . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
     *B.*     *Second Disputed Statement* . . . . . . . . . . . . . . . . . . . . . . . . . *9*
     *C.*     *Third Disputed Statement* . . . . . . . . . . . . . . . . . . . . . . . . . *10*
*V.*    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*

## *I. INTRODUCTION*

The matter before the court is Defendant Donald J. Herbst, Sr.'s "Motion for New Trial" ("Motion") (docket no. 50). In the Motion, Defendant raises, for the first time, allegations of prosecutorial misconduct. The court notes that Defendant had ample opportunity to raise such issues before the case was submitted to the jury. Nevertheless, the court will address Defendant's allegations.

## II. RELEVANT PROCEDURAL HISTORY

On July 27, 2010, a grand jury returned an eleven-count Superseding Indictment (docket no. 11) against Defendant. Count 1 charged Defendant with conspiracy to buy, receive or possess stolen goods, in violation of 18 U.S.C. §§ 317 and 659. Counts 2 through 11 charged Defendant with buying, receiving or possessing stolen goods, in violation of 18 U.S.C. § 659. The Indictment also contains a forfeiture allegation.

From September 27, 2010 to October 1, 2010, the court held a jury trial. Attorney Michael Lahammer represented Defendant, who was personally present. Assistant United States Attorney Richard Murphy represented the government. On October 1, 2010, the jury returned guilty verdicts on Counts 1 through 4 and 6 through 11. The jury returned a not guilty verdict on Count 5.

On October 13, 2010, Defendant filed the Motion. On October 26, 2010, the government filed a Resistance (docket no. 55). The Motion is fully submitted and ready for decision.

## III. TRIAL EVIDENCE

The parties presented the following evidence, relevant for purposes of the Motion, at trial:

### A. Defendant

Defendant is sixty-six years of age. He is married to Juanita Herbst and lives in Dubuque, Iowa. Defendant and his wife own Dubuque Hose and Hydraulic, a business in Dubuque, Iowa. Between about September 2006 and September 2007, Defendant purchased a large quantity of stolen meat from James and Patricia Patterson. Defendant testified that he did not know the meat was stolen.

### B. Law Enforcement Discovers the Pattersons' Scheme

James and Patricia Patterson are married and live in Zwingle, Iowa. At the time of Defendant's offenses of conviction, James Patterson was employed as a truck driver by

McFarland Truck Lines, Inc., Austin, Minnesota. McFarland Truck Lines, Inc. hauled various products, including Farmland Foods meat products to and from distribution centers, primarily in Illinois. James Patterson began stealing meat products from his loads and selling the meat to Defendant and others in Northeast Iowa.

In September of 2007, Farmland hired a private investigator, Paul Moore, to investigate product shortages. Moore testified that he observed the Pattersons transporting stolen meat in their van to Defendant's residence. Moore informed law enforcement in Dubuque, Iowa. On September 30, 2007, law enforcement confronted the Pattersons and executed a search warrant at their home. When James Patterson agreed to cooperate, law enforcement decided to execute a "controlled meat buy" between James Patterson and Defendant. James Patterson called Defendant and informed him that he had a large quantity of bacon-wrapped pork filets available. Defendant agreed to purchase the bacon-wrapped pork filets. Law enforcement recorded this telephone conversation and the government introduced the recording as an exhibit at trial. Law enforcement also placed a wire recording device on James Patterson to record any statements made during the controlled buy. This recording was also admitted as an exhibit at trial.

Later that evening, James Patterson drove his van, filled with meat, to Dubuque Hose and Hydraulic to execute the controlled buy. The wire recorded Defendant's statements. Defendant told James Patterson that he was careful and that he did not want to get in trouble. After the controlled buy, law enforcement confronted Defendant. Defendant denied committing any crimes.

Law enforcement then executed a search warrant at the Herbst residence where they seized a large amount of meat and $61,750 from a safe. $42,400 was in a bank bag inside the safe and the remaining amount was outside the bank bag. Defendant initially told law enforcement there was approximately $15,000 in the safe. At trial, he testified that he "wanted to downplay it because [law enforcement officers] said they were going to take

3

the money and I said, 'there ain't that much in there[.]'" Transcript (docket no. 57) at 36. Defendant denied "downplaying" the amount of money to misrepresent his role in stolen meat sales. *Id.* He said that the money was used in connection with the business, Dubuque Hose and Hydraulic, and that much of the money was old and had been there for a long period of time. Juanita Herbst testified that the money smelled old and musty.

James and Patricia Patterson pleaded guilty to one count of theft of interstate shipments, in violation of 18 U.S.C. § 659. Patricia Patterson was sentenced to twenty-four months imprisonment followed by three years of supervised release. James Patterson pleaded guilty to one count of theft from interstate shipments, in violation of 18 U.S.C. § 659; one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i); and one count of conspiracy to commit theft by fraud of property valued in excess of $1000, in violation of 18 U.S.C. § 371. James Patterson was sentenced to twenty-seven months imprisonment followed by three years of supervised release. James and Patricia Patterson testified at trial and described the process by which they sold meat to Defendant. James Patterson testified that he never told Defendant that the meat was stolen, but believed it was understood that the meat was, in fact, stolen. He stated that Defendant bought about two-thirds of the meat he and his co-conspirators stole from McFarland Truck Lines, Inc.

### C. Civil Settlement and Forfeiture

Defendant testified that he settled a civil lawsuit with McFarland Truck Lines, Inc. He testified that he did not admit any wrongdoing by settling that suit and that he did not want to "pull [his wife] through a civil trial," because she was dealing with "health issues" at that the time. *Id.* at 110. Defendant settled the lawsuit for $185,000 for "meat product[s] wrongfully converted and resold[.]" *Id.* at 112. He also agreed to forfeit $15,000 of the $61,750 that was seized at his home.

### D. Robert McQuillen

Robert McQuillen, a certified public accountant, testified as a defense witness at trial. McQuillen testified that Defendant has been "a long-time client" of his and that he has "worked with [Defendant] on his accounting and tax matters." Transcript (docket no. 61) at 4. He described the process by which he completes Defendant's taxes. He typically meets with Defendant twice a year. At the meeting in November or December, McQuillen and Defendant usually discuss Dubuque Hose and Hydraulic's tax return. At the meeting in November of 2007, Defendant spoke to McQuillen regarding his involvement in meat sales. At trial, Defendant admitted Exhibit G, which McQuillen testified was Defendant's Schedule C tax return. This exhibit indicated that Defendant reported the income from meat sales in 2007. With respect to reporting the income from the meat sales, McQuillen testified that "[Defendant] had a gross profit from the actual selling, but then there was some legal expenses that came up that were paid in 2007, and we judged that they were, in part due to this activity, so we . . . deducted enough to take him down to 0, but we couldn't take it into a loss because of the lack of profit motive." *Id.* at 9.

### IV. ANALYSIS

Defendant moves for a new trial "pursuant to [Federal Rule of Criminal Procedure] 33, based on prosecutorial misconduct[.]" Motion at 1. Specifically, Defendant alleges that "[d]uring closing arguments counsel for the government made several statements that were either false or contrary to the jury instructions given to the jury by the Court." Defendant's Brief in Support of the Motion ("Def. Brief") (docket no. 50-1) at 1. For the reasons stated herein, the court finds that the prosecutor did not make false statements or argue contrary to the jury instructions. This conclusion is apparent when considering the arguments made in the context of the trial evidence and when understanding the nature, purpose and parameters of closing arguments, generally.

5

"Trial courts have broad discretion in controlling closing arguments[.]" *United States v. Beckman*, 222 F.3d 512, 526 (8th Cir. 2000). However, "the prosecution must have reasonable latitude to fashion closing arguments." *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991). "Prosecutors are entitled to argue reasonable inferences to be drawn from the facts in evidence during closing arguments, including an inference that the defendant is not credible." *United States v. Frokjer*, 415 F.3d 865, 874 (8th Cir. 2005) (internal citation omitted).

To obtain a new trial based on prosecutorial misconduct, Defendant "must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced [his] rights in obtaining a fair trial." *United States v. King*, 36 F.3d 728, 733 (8th Cir. 1994). Examples of improper statements or arguments include: shifting the burden to the defense by arguing that the jury must find that a prosecution witness lied in order to acquit, *United States v. Miller*, 621 F.3d 723, 730-32 (8th Cir. 2010), arguing that a law enforcement officer must have been truthful, because he had no reason to "risk his career and reputation," *United States v. Swiatek*, 819 F.2d 721, 731 (7th Cir. 1987), referring to defense counsel's "slick tactics," *United States v. Lopez*, 414 F.3d 954, 960 (8th Cir. 2005), and mischaracterizing or manipulating the evidence, *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986).

If Defendant can show that the prosecutor's statements were improper, the court, in assessing the second prong, "consider[s] the cumulative effect of the improprieties, the strength of the evidence against [Defendant], and whether the district court took any curative action." *United States v. Milk*, 447 F.3d 593, 602 (8th Cir. 2006). "The critical question . . . is whether the argument of which [Defendant] complains was so offensive as to deprive [him] of a fair trial. *Beckman*, 222 F.3d at 526.

### *A. First Disputed Statement*

Defendant alleges that the following statement constituted prosecutorial misconduct by implying that the jury should disobey one of the court's instructions and by misstating the evidence:

> Well, why are you protecting the money in the safe? Why is the money in the safe at risk unless it's tied to some illegal activity? Police can't just come in and take money and seize it and forfeit it unless it's tied to some activity. So if it's tied to something improper, that's why he's concerned about it being taken. And then, of course, he gave back, forfeited, agreed to forfeit 15,000 of it, but he said none of it had anything to do with the criminal activity. And sure, there's a different standard of proof in a civil versus a criminal case, but why would you give any of it back? Why would you give any of it back under any standard of proof if it had nothing to do with nothing?

> Was the money in that safe not used in connection with this activity? He settled a civil lawsuit for a large amount of money. And the settlement, as he admitted, the words were for—it was settled for meat wrongfully converted and sold by him and his family. Wrongfully converted and sold. Settled for 185,000 [sic]. And you heard Mr. McFarland say he settled with Farmland for $175,000 for the meat that was lost, for $175,000. He settled for 185,000, which included some attorney's fees, and 115,000 was for the meat wrongfully converted and sold. And that's interesting. 115,000 over 175,000 is about two-thirds. It's about two-thirds. And what did Jimmy Patterson say? *He got about two-thirds of the meat that we stole*. Now, again, there's a different standard of proof. Would you pay a large chunk of money like that if you didn't do anything wrong?

Transcript (docket no. 58) at 19.

The jury instruction at issue is:

> You have heard evidence that the defendant was involved in civil cases related to this case and that settlements were

7

> reached in each of them. You are instructed that these settlements are not proof that the defendant committed any of the crimes alleged in the Indictment. The burden of proof in any civil action is by a preponderance of the evidence, which is a much lesser burden of proof than in a criminal case, which is beyond a reasonable doubt.
>
> You are instructed that you may give the evidence regarding settlement such weight as you decide it deserves in relation to this case.

Final Jury Instruction No. 22 (docket no. 44).

The court finds that the above excerpt of the prosecutor's closing argument did not constitute an improper statement. The arguments related to the seizure of the money in the safe represent the prosecutor interpreting the facts and inviting the jury to draw a reasonable inference, which is permissible. *Frokjer*, 415 F.3d at 874. The arguments related to the civil settlement also do not constitute prosecutorial misconduct. The court's instruction informed the jury about the different standards of proof in civil cases and criminal cases. It cautioned the jury against using the civil settlement as proof that Defendant committed the crimes charged in the Indictment, but did not preclude the jury from giving the settlement any weight whatsoever. The prosecutor's argument uses the civil settlement to question Defendant's credibility and to posit why Defendant settled the civil case if he felt he was not responsible for McFarland Truck Line Inc.'s loss. Defendant was free to argue, and did argue, that he had alternate reasons for settling the case. Defendant argued that "[p]eople settle cases for all sorts of reasons in civil litigation" and that, because his wife was undergoing chemotherapy at the time of the civil case, "some things are more important than money." Transcript (docket no. 58) at 53. This sort of back and forth interpretation of the evidence is precisely the point of closing argument.

Because the court finds that the first disputed statement was not improper, it need not consider whether it prejudiced Defendant. *See King*, 36 F.3d at 733. In any event, the court finds that even if the above statement were improper, it was not so "offensive as to deprive [him] of a fair trial." *Beckman*, 222 F.3d at 526. First, the evidence of guilt was strong. Second, with respect to the statements regarding the civil settlement, the court instructed the jury—as Defendant requested—that the settlement was not proof of Defendant's guilt and explained the different burdens of proof.[1] Therefore, the court's jury instructions cured any improper statement.

### B. Second Disputed Statement

Defendant alleges the following statement constituted prosecutorial misconduct:

> And in regards to the bank bag and the safe, the money in the safe and how the—this was paid for, the—I'd ask you to consider the following. First, the defendant claimed a tax deduction for legal expenses related to his business. Legal expenses related to his business, and that's on Defendant's Exhibit G, to his meat sales business. And although it ended up not mattering because he doesn't exceed the threshold, but he tried—he claimed $390 for legal and professional services. And that was, as you remember the testimony of Mr. McQuillen, that was because those were assets. He was trying to protect assets related to the business, right? So the 61,000 was related to the business, which means it had to be meat sales or else it's not appropriate to take that deduction.

Transcript (docket no. 58) at 70. Again, the court finds that this statement was simply a permissible invitation to the jury to make an inference regarding Defendant's credibility based on evidence in the record. For the same reasons as the first disputed statement, the court finds that even if this statement were improper, it did not prejudice Defendant.

---

[1] Defendant gave the court a written proposed instruction relative to the civil settlement. The court gave the instruction exactly as Defendant requested.

### C. Third Disputed Statement

Defendant contends the prosecutor engaged in misconduct, when he stated:

> Well, it doesn't make any difference. The bottom line is, he didn't go to anybody until after he got in trouble. But as to this statement, that—his meeting with the tax accountant, he had no idea he was going to be charged, well, that's interesting because he took a tax deduction because supposedly there were attorneys that had been hired to help defend actions that would be taken against him in connection with that matter.

Transcript (docket no. 58) at 89. This statement was not improper. The prosecutor did not misstate or mischaracterize any evidence or engage in any other improper conduct. Again, the prosecutor was simply asking the jury to make an inference regarding Defendant's credibility. The court finds that even if this statement was improper that it, alone or coupled with all the other statements, did not prejudice Defendant.

### V. CONCLUSION

For the foregoing reasons, the court finds that Defendant's accusations against the prosecutor of professional misconduct are totally without merit. Accordingly, the Motion (docket no. 50) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 16th day of November, 2010.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA