**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 10-CR-1008-LRR |
| vs. | **SENTENCING MEMORANDUM** |
| DONALD J. HERBST, Sr., | |
| Defendant. | |

————————————

*TABLE OF CONTENTS*

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   **RELEVANT PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . . **2**

III.  **SENTENCING FRAMEWORK** . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   **EVIDENTIARY RULES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

V.    **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    A.    **Defendant** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    B.    **Law Enforcement Discovers the Pattersons' Scheme** . . . . . . . . . . . . **5**
    C.    **Pattersons' Minor Daughters** . . . . . . . . . . . . . . . . . . . . . . . . **7**
    D.    **Donald Herbst, Jr.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
    E.    **Doug Beidler** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
    F.    **Farmland's and McFarland's Losses** . . . . . . . . . . . . . . . . . . . **8**
    G.    **Civil Settlement Agreements** . . . . . . . . . . . . . . . . . . . . . . . . **8**

VI.   **ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

    A.    **Chapter Two: Specific Offense Characteristics** . . . . . . . . . . . . . **9**
        1.    **Undisputed enhancements** . . . . . . . . . . . . . . . . . . . . . **9**
        2.    **Amount of loss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
            a.    **Defendant's responsibility for entire amount of loss** . . **10**
            b.    **Value of the stolen meat** . . . . . . . . . . . . . . . . . . **12**
            c.    **Investigative, legal and management costs** . . . . . . . . **13**
                i.    **Phoenix Loss Prevention fees** . . . . . . . . . . . . **14**
                ii.   **Attorneys' fees** . . . . . . . . . . . . . . . . . . . . . **14**
                iii.  **Management expenses** . . . . . . . . . . . . . . . . . **15**

        *d.*      *Total loss amount* . . . . . . . . . . . . . . . . . . . . . . . . . **17**
    **B.**     **Chapter Three, Part B Adjustments: Role in the Offense** . . . . . . . . **17**
        **1.**     *Aggravating role* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
        **2.**     *Use of a minor* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
    **C.**     **Chapter Three, Part C Adjustments: Obstruction** . . . . . . . . . . . . . **20**
    **D.**     **Chapter Three, Part E Adjustments: Acceptance of Responsibility** . . **21**
    **E.**     **Pre-Departure/Variance Advisory Guidelines** . . . . . . . . . . . . . . **23**

**VII.**   **DEPARTURES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

**VIII.**  **VARIANCES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

**IX.**    **FINE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**X.**     **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

## I. INTRODUCTION

The matter before the court is the sentencing of Defendant Donald J. Herbst, Sr.

## II. RELEVANT PRIOR PROCEEDINGS

On July 27, 2010, a grand jury returned an eleven-count Superseding Indictment (docket no. 11) against Defendant. Count 1 charged Defendant with conspiracy to buy, receive or possess stolen goods, in violation of 18 U.S.C. §§ 371 and 659. Counts 2 through 11 charged Defendant with buying, receiving or possessing stolen goods, in violation of 18 U.S.C. § 659. The Indictment also contains a forfeiture allegation.

From September 27 to October 1, 2010, the court held a jury trial. Attorney Michael Lahammer represented Defendant, who was personally present. Assistant United States Attorney Richard Murphy represented the government. On October 1, 2010, the jury returned guilty verdicts on Counts 1 through 4 and 6 through 11. The jury returned a not guilty verdict on Count 5.

On November 10, 2010, the United States Probation Office ("USPO") released a draft of Defendant's Presentence Investigation Report ("PSIR") (docket no. 65). Both parties lodged objections to the PSIR. On December 10, 2010, the USPO released a revised PSIR (docket no 74).

On January 31, 2011, the government filed its Sentencing Memorandum ("Gov't. Sent. Mem.") (docket no. 79). The government also requests an upward departure and/or variance within its Memorandum. That same day, Defendant filed his Sentencing Memorandum ("Def. Sent. Mem") (docket no. 80). Defendant requests a downward variance in his Memorandum.

On February 14, 2011, the court commenced Defendant's sentencing hearing ("Hearing"). Assistant United States Attorney Richard Murphy represented the government. Attorney Michael Lahammer represented Defendant, who was personally present. At the Hearing, the court received evidence, heard argument and listened to Defendant's allocution. The court advised the parties that it would take the sentencing issues under advisement, issue a written opinion and then reconvene the Hearing to impose sentence.

All contested issues in Defendant's sentencing are now fully submitted and ready for decision.

### III.  SENTENCING FRAMEWORK

A "district court should begin [a sentencing proceeding] with a correct calculation of the [defendant's] advisory Sentencing Guidelines range." *United States v. Braggs*, 511 F.3d 808, 812 (8th Cir. 2008). A defendant's Guidelines range "is arrived at after determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted." *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008).

"[A]fter giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.*

(quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)); *see, e.g.*, *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.").

The district court "has substantial latitude to determine how much weight to give the various factors under § 3553(a)." *United States v. Ruelas-Mendez*, 556 F.3d 655, 657 (8th Cir. 2009); *see also United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) ("'[I]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable.'" (quoting *United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)). "If the court determines that a sentence outside of the Guidelines is called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Braggs*, 511 F.3d at 812 (quoting *Gall*, 128 S. Ct. at 597). "The sentence chosen should be adequately explained so as 'to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *Id.*

## IV.  EVIDENTIARY RULES

The court makes findings of fact by a preponderance of the evidence. *See, e.g.*, *United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the [Sentencing Guidelines] are applied in an advisory manner."). The court considers a wide variety of evidence, including the undisputed portions of the PSIR, as well as the testimony and other evidence the parties introduced at trial and at the Hearing. The court does not "put on blinders" and only consider the evidence directly underlying Defendant's offenses of conviction. In calculating Defendant's Guidelines range, for example, the court applies the familiar doctrine of relevant conduct. *See* USSG §1B1.3 (2008). The Eighth Circuit Court of Appeals has repeatedly held that a district court may consider uncharged, dismissed and even acquitted conduct at sentencing. *See, e.g.*, *United States v. Whiting*,

522 F.3d 845, 850 (8th Cir. 2008). When relevant and "accompanied by sufficient indicia of reliability to support the conclusion that it [was] probably accurate," the court credits hearsay. *United States v. Sharpfish*, 408 F.3d 507, 511 (8th Cir. 2005). The sentencing judge is afforded great discretion in determining the credibility of witnesses and making findings of fact. *United States v. Bridges*, 569 F.3d 374, 378 (8th Cir. 2009).

## V.  *FACTS*[1]

The court draws the following facts from the uncontested portions of the PSIR,[2] and the evidence presented at the trial and the Hearing:[3]

### A. *Defendant*

Defendant is sixty-six years of age. He has resided in Dubuque, Iowa his entire life. He has been married to Juanita Herbst for forty-five years. Defendant and his wife own Dubuque Hose and Hydraulic, a business in Dubuque, Iowa. Between about September 2006 and September 2007, Defendant purchased a large quantity of stolen meat from James and Patricia Patterson. Defendant maintained at trial, and still maintains, that he did not know the meat was stolen.

### B. *Law Enforcement Discovers the Pattersons' Scheme*

James and Patricia Patterson (together, "the Pattersons") are married and live in Zwingle, Iowa. At the time of Defendant's offenses of conviction, James Patterson was employed as a truck driver by McFarland Truck Lines, Inc. ("McFarland"). McFarland

---

[1] The government includes a thorough list of facts that it maintains should be included in the offense conduct portion of the PSIR. The court has reviewed these facts and finds that they are accurate. The court relies on all facts, whether included in the PSIR or not, that were supported by the evidence at trial and at the Hearing.

[2] In other words, the court does not consider the objected-to portions of the PSIR that are unsupported by evidence presented at trial or the Hearing.

[3] The court makes additional factual findings in conjunction with its conclusions of law.

hauled various products, including Farmland Foods ("Farmland") meat products to and from distribution centers, primarily in Illinois. James Patterson began stealing meat products from his loads and selling the meat to Defendant and others in Northeast Iowa.

In September of 2007, Farmland hired a private investigator, Paul Moore, to investigate product shortages. Moore observed the Pattersons transporting stolen meat in their van to Defendant's residence and subsequently informed law enforcement in Dubuque, Iowa. On September 30, 2007, law enforcement confronted the Pattersons and executed a search warrant at their home. When James Patterson agreed to cooperate, law enforcement orchestrated a "controlled meat buy" between James Patterson and Defendant. James Patterson called Defendant and informed him that he had a large quantity of bacon-wrapped pork filets available. Defendant agreed to purchase them. Law enforcement recorded this telephone conversation and the government introduced the recording at trial. Law enforcement also placed a recording device on James Patterson to record any statements made during the controlled buy. This recording was also admitted at trial.

Later that evening, James Patterson drove his van, filled with meat, to Dubuque Hose and Hydraulic to execute the controlled buy. Defendant told James Patterson that he was careful about who he sold to and that he did not want to get in trouble. After the controlled buy, law enforcement confronted Defendant. Defendant denied committing any crimes.

Law enforcement then executed a search warrant at the Herbst residence, where they seized a large amount of meat and $61,750 in currency from a safe. $42,400 in currency was in a bank bag inside the safe and the remaining amount was outside the bank bag. Defendant initially told law enforcement there was approximately $15,000 in the safe. At trial, Defendant testified that he "wanted to downplay it because [law enforcement officers] said they were going to take the money and I said, 'there ain't that

much in there[.]'" Transcript (docket no. 57) at 36. Defendant denied "downplaying" the amount of money to misrepresent his role in stolen meat sales. *Id.* He said that the money was used in connection with his business, Dubuque Hose and Hydraulic, and that much of the money was old and had been there for a long time. Juanita Herbst testified that the money smelled old and musty.

Patricia Patterson pleaded guilty to one count of theft of interstate shipments, in violation of 18 U.S.C. § 659. She was sentenced to twenty-four months imprisonment followed by three years of supervised release. James Patterson pleaded guilty to one count of theft from interstate shipments, in violation of 18 U.S.C. § 659; one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i); and one count of conspiracy to commit theft by fraud of property valued in excess of $1000, in violation of 18 U.S.C. § 371. James Patterson was sentenced to twenty-seven months imprisonment followed by three years of supervised release. James and Patricia Patterson testified at trial and described the process by which they sold meat to Defendant. James Patterson testified that he never told Defendant that the meat was stolen, but believed it was understood that the meat was, in fact, stolen. He stated that Defendant bought about two-thirds of the meat he and his co-conspirators stole from McFarland.

### C. Pattersons' Minor Daughters

At trial, the government presented evidence, including the testimony of the Pattersons' minor daughter, regarding the standard procedure that the Pattersons used to deliver meat to Defendant. Patricia Patterson frequently delivered the meat with the help of one or both of her minor daughters. James Patterson also delivered meat to Defendant, although less frequently than his wife. When James Patterson delivered the meat, he too, was often accompanied by one of his minor daughters. The Pattersons' minor daughters helped unload the meat from the van onto Defendant's garage floor.

### D. Donald Herbst Jr.

In December 2006, Defendant and his wife traveled to Texas for the winter. Before leaving, Defendant gave his son, Donald Herbst, Jr., an envelope containing currency and instructed him to buy meat with the money should the Pattersons call while Defendant was away. Defendant also provided his son with a list of people to whom Defendant sold meat. Donald Herbst, Jr. purchased meat with the cash provided by his father several times while his parents were away.

### E. Doug Beidler

Doug Beidler is Defendant's son-in-law. At trial, Beidler testified that he had received meat from Defendant and that he had previously lied to law enforcement regarding that meat. He testified that he lied because Defendant told him to "keep his mouth shut" if law enforcement questioned him about the meat.

### F. Farmland's and McFarland's Losses

In September 2007, Farmland hired Phoenix Loss Prevention, Inc. to investigate suspected loss occurring at the AmeriCold storage facility in East Dubuque, Illinois. Phoenix Loss Prevention determined that the loss was not occurring at AmeriCold, but rather was a result of McFarland's drivers stealing product from their loads. Farmland spent $41,301.52 on this investigation.

Phoenix Loss Prevention estimated that the Pattersons' scheme caused Farmland to lose $188,075.56 worth of meat products.

### G. Civil Settlement Agreements

In November, 2007, McFarland and Farmland entered into an agreement to settle Farmland's claims against McFarland for $175,000. In March, 2010, McFarland and Defendant and his family members entered into a settlement agreement to settle McFarland's claims against them for $175,000.

## VI.  ISSUES

The instant Sentencing Memorandum addresses the following contested Guidelines issues: (1) the amount of loss, as calculated pursuant to USSG §2B1.1(b)(1); (2) whether Defendant had a supervisory role in the offense, pursuant to §3B1.1; (3) whether Defendant used a minor to commit the offense, pursuant to §3B1.4; (4) whether the court should assess a two-level upward adjustment for obstruction of justice, pursuant to §3C1.1; and (5) whether the court should assess a two-level downward adjustment for acceptance of responsibility pursuant to §3E1.1.  The government bears the burden of proof on all of these issues, with the exception of acceptance of responsibility.  *See United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2004) (stating that the government bears the burden to prove sentencing enhancements).  The parties also make a number of arguments related to departures, variances and Defendant's ability to pay a fine.  These arguments are also addressed in the instant Sentencing Memorandum.[4]

### A. Chapter Two: Specific Offense Characteristics

### 1.      Undisputed enhancements

The parties agree that the base offense level is **6** pursuant to §2B1.1(a)(2).  The parties also agree that a **2**-level enhancement pursuant to §2B1.1(b)(4) is appropriate, because "the offense involved receiving stolen property, and [Defendant] was a person in the business of receiving and selling stolen property[.]"  Finally, the parties agree that a **2**-level enhancement pursuant to §2B1.1(b)(12)(B) is appropriate, because "the offense involved an organized scheme to steal or to receive stolen . . . goods or chattels that are part of a cargo shipment."  The addition of these enhancements brings Defendant's base offense level to **10**.

---

[4] The parties have agreed to a restitution amount, which Defendant has paid. Accordingly, this Memorandum does not address restitution.

## 2. *Amount of loss*

The parties disagree on the amount of loss involved in the offense. The PSIR calculates the amount of loss to be between $120,000 and $200,000, resulting in an increase of **10** levels. USSG §2B1.1(b)(1)(F). The government argues that the loss exceeded $400,000, which would result in an increase of **14** levels. USSG §2B1.1(b)(1)(H). Defendant argues that the amount of loss was approximately $55,000, which would result in an increase of **6** levels. USSG §2B1.1(b)(1)(D).

"[L]oss is the greater of actual loss or intended loss." USSG §2B1.1, cmt. (n.3(A)). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." USSG §2B1.1, cmt. (n.3(A)(i)). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense." USSG §2B1.1, cmt. (n.3(A)(ii)). "The court need only make a reasonable estimate of the loss." USSG §2B1.1, cmt. (n.3(C)). The advisory Guidelines provide for certain exclusions from the loss calculation, including "[c]osts to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense." USSG §2B1.1, cmt. (n.3(D)).

The amount of loss in the instant case involves three issues: (1) whether Defendant is responsible for the entire loss caused by the Patterson scheme; (2) how to value the meat Farmland lost as a result of the scheme; and (3) which, if any, investigative, legal and management costs should be included in the loss calculation. The court addresses these issues, in turn.

### a. *Defendant's responsibility for entire amount of loss*

The government argues that "[w]hile [D]efendant may have only personally received and sold about two-thirds of the stolen meat, there is no principled basis for not holding defendant accountable for the value of all the meat stolen as part of the 'same

course of conduct or common scheme or plan[.]'" Gov't. Sent. Mem. at 21 (quoting USSG §1B1.3(a)(2)).

To ascertain Defendant's responsibility for the amount of loss, the court looks to the doctrine of relevant conduct, described in USSG §1B1.3. "The Guidelines include as relevant conduct in the case of a jointly undertaken criminal activity all (1) 'reasonably foreseeable acts and omissions of others' (2) 'in furtherance of' (3) 'the jointly undertaken criminal activity.'" *United States v. Spotted Elk*, 548 F.3d 641, 673 (8th Cir. 2008) (quoting USSG §1B1.3(a)(1)(B)). Although these elements closely mirror the requirements for conspiracy liability, "the commentary to USSG §1B1.3 explains that the concepts of relevant conduct under the Guidelines, on the one hand, and conspiracy liability, on the other, are not the same[.]" *Id*. The commentary "shows that while the emphasis in substantive conspiracy liability is the scope of the *entire conspiracy* and foreseeability in light of that scope, the emphasis under §1B1.3 is the scope of the *individual defendant's* undertaking and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole[.]" *Id*. at 673-74. Further, the commentary directs that an individual defendant is not responsible for "the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct." USSG §1B1.3, cmt. (n.2).

The court must make an individualized assessment of Defendant's role in the conspiracy. It is inappropriate to simply impute the loss caused by the entire conspiracy to Defendant without first completing this assessment. *See United States v. White*, 77 F. App'x. 678, 681-82 (4th Cir. 2003) (vacating and remanding a sentence after determining that the PSIR contained "insufficient findings" regarding "both 'the scope of the defendant's agreement' and 'the foreseeability of his co-conspirator's conduct before holding the defendant accountable for the scope of the entire conspiracy'") (quoting *United States v. Bolden*, 325 F.3d 471, 499 (4th Cir. 2003)). In *White*, the defendant was

involved in a burglary conspiracy that involved the theft of various commercial supplies. *Id.* at 679. The PSIR described the defendant as the "fence primarily responsible for the smaller [stolen] equipment." *Id.* at 680 (internal quotation marks omitted). It described two of the defendant's co-conspirators as "the fence primarily responsible for the large types of [stolen] equipment." *Id.* (internal quotation marks omitted). The PSIR computed the amount of loss attributable to the defendant as the entire amount of loss caused by the conspiracy. *Id.* The Fourth Circuit Court of Appeals vacated the sentence and remanded the case for an individualized determination of the defendant's role and the loss it caused.

Here, the court agrees with USPO's decision to hold Defendant accountable for two-thirds of the amount of stolen meat. The government has not proven by a preponderance of the evidence that Defendant jointly undertook criminal activity with anyone other than the Pattersons. At the Hearing, the government argued that Defendant's knowledge of the Pattersons' other customers proves that Defendant should be responsible for the entire loss of the conspiracy. This knowledge alone, however, does not prove that Defendant affirmatively undertook criminal activity with these other customers. The evidence arguably suggests that Defendant jointly undertook criminal activity with Butch Maas, because Maas told Defendant that he had a meat source. However, the government has failed to prove by a preponderance how much loss caused by Maas should be attributed to Defendant.

Again, the court need only make a reasonable estimate of the loss. James Patterson testified that Defendant bought about two-thirds of the meat he and his co-conspirators stole. Accordingly, the court shall attribute two-thirds of the value of the stolen meat to Defendant.

### b. *Value of the stolen meat*

The government appears to argue that the court should use the retail value of the stolen meat to arrive at its loss calculation. *See* Gov't. Sent. Mem. at 20 (stating

"[a]ccording to officials with [Farmland], the actual market value (retail value) of the stolen meat is easily double, if not triple or greater, than the wholesale value"). In support of its argument, the government cites USSG §2B1.1, cmt. (n.3(C)(i)), which states that "[t]he fair market value of the property unlawfully . . . taken" is one factor to consider in the loss calculation.

The court declines to use the retail value of the meat as the measure of loss in this case. Farmland is not a retailer, it is a wholesaler. Accordingly, if Farmland is unable to sell its goods, it does not lose the retail price of those goods, but rather the wholesale value. Additionally, the comment the government cites is unpersuasive. First, it is only one of many factors to be considered. It does not bind the court to a certain measure in cases involving stolen property. Second, it does not direct the court to consider the retail value, but rather the *market* value. In this case, the applicable market is the wholesale market, and the court shall use the wholesale price in its calculation. *See United States v. Coviello*, 225 F.3d 54, 63 (1st Cir. 2000) (affirming district court's use of wholesale value of software where the defendants stole the software from the wholesaler and relying on district court's determination of wholesale price after hearing testimony from office supply store representative as to the wholesale prices it paid for the software products).

The testimony at trial showed that the wholesale value of the lost product was $187,424.56. Two-thirds of this figure is $123,700.21. The court shall use this figure in its loss calculation.[5]

### c. *Investigative, legal and management costs*

The parties dispute which costs incurred by Farmland and McFarland for legal, investigative and management expenses should be included in the loss calculation. The

_____

[5] The court's figure is slightly different from USPO's. USPO used the amount of the settlement to calculate the product loss. The settlement amount included more than just the amount of the lost product. It included legal fees and the like.

government contends the loss calculation should include: (1) Phoenix Loss Prevention's fee of $41,301 paid by Farmland; (2) attorneys' fees in the amount of $66,000 paid by McFarland; and (3) $98,000 in time and management expenses related to the theft expended by McFarland. USPO calculated the loss to include the full amount of Phoenix Loss Prevention's fee and $30,559.60 of McFarland's attorneys' fees. USPO did not include the $98,000 for McFarland's time and management expenses.

Consequential damages should not be included in the loss calculation. *United States v. DeRosier*, 501 F.3d 888, 895 (8th Cir. 2007) (citing USSG §2B1.1). "Consequential damages are defined as losses that do not flow directly and immediately from an injurious act, but that result indirectly from the act." *Id.* (citing *Black's Law Dictionary* 395 (7th ed. 1990)). The Eighth Circuit Court of Appeals has held that attorneys' fees, legal fees and costs related to investigation are not consequential and should be included in the loss amount. *Id.* Although these costs should be included, the Guidelines except "costs incurred by victims primarily to aid the government in[] the prosecution and criminal investigation of an offense." USSG §2B1.1, cmt. (n.3(D)(ii)).

### i.     *Phoenix Loss Prevention fees*

The court finds that Phoenix Loss Prevention's fee should be included in the loss calculation. Phoenix Loss Prevention's services were not used primarily to aid the government. The evidence presented at trial and the Hearing shows that Phoenix Loss Prevention was used primarily to determine the cause of the loss from loads originating from the AmeriCold storage facility in East Dubuque, Illinois. Accordingly, the court shall include $41,301 in its loss calculation.

### ii.     *Attorneys' fees*

The government contends that $66,000 in attorneys' fees should be included in the loss amount. USPO included attorneys' fees of $33,559.60, because "it is difficult to determine if the legal expenses incurred by [McFarland] after James Patterson was charged

for conduct associated with the instant federal offenses on August 18, 2009, were 'incurred primarily to aid' in the prosecution or investigation of the instant offenses[.]" PSIR at 23 (quoting USSG §2B1.1, cmt. (n.3(D)(ii))). The settlement agreement in the civil case states that $60,000 of the agreed upon settlement of $175,000 "represent[s] reimbursement to [McFarland] of attorney's fees and other costs and disbursement incurred in connection with the prosecution of this action[.]" Settlement Agreement (docket no. 79-5) at 3. At the Hearing, Geoff Baker, President of McFarland, testified that McFarland's attorneys' fees exceeded $66,000. Regarding the purpose of those fees, Baker stated that "[t]he bulk of those fees were associated with a civil action [McFarland] initiated against [Defendant] and the Pattersons." He further testified that "just a few of those $66,000" was used to aid the government in its prosecution.

Again, the court is charged with the task of calculating a "reasonable estimate of the loss." USSG §2B1.1, cmt. (n.3(C)). The government bears the burden of proving the amount of loss by a preponderance of the evidence. The court finds there is insufficient evidence in the record to find that the entire $66,000 should be used in the loss calculation, but that more than $33,559.60 should be added to the calculation. Baker's testimony established that only a small amount of the $66,000 was used to aid the government in its prosecution. Accordingly, the court shall include $56,000 in attorneys' fees in its loss calculation.

### iii.    Management expenses

The government objects to USPO's failure to include $98,000 in time and management expenses in the loss amount.[6] Geoff Baker described these expenses at the Hearing:

---

[6] The court included this amount in ordering restitution in the related cases, *United States v. James Patterson*, 09-CR-1015-LRR; *United States v. Patricia Patterson*, 10-CR-1002-LRR; and *United States v. Lloyd Patterson*, 10-CR-1011-LRR, but did not include it in the loss calculation.

> Since we found out about this -- this series of thefts and the
> theft ring that was associated with it in, I believe, 2006, our
> company has spent a fair amount of time dealing with all of the
> problems associated with the thefts. The bulk of that, we kept
> track of all of our time. It's my time and the time of the
> managers that work for me spent dealing with the thefts, the
> customer problems that were created, preparing for civil trial,
> that was -- that's the bulk of what we did.

He further testified that the management fees do not include expenses incurred as a result
of testifying at various hearings related to this matter.

Loss means "the reasonably foreseeable pecuniary harm that resulted from the
offense." USSG §2B1.1, cmt. (n.3(A)(i)). Consequential losses are not to be included in
the calculation. Thus, "if a defendant steals an automobile[,] the applicable loss would be
the fair market value of the car. It would not include the victim's consequential losses,
like paying for public transportation or missing work[.]" *United States v. Izydore*, 167
F.3d 213, 223 (5th Cir. 1999). In the realm of time and management, a consequential loss
would include a staff meeting to discuss the criminal activity. *United States v. Sablan*, 92
F.3d 865, 870 (9th Cir. 1996).

The court finds that the government has not proven the time and management losses
by a preponderance of the evidence. Clearly, scenarios exist in which some time and
management expenses could be reimbursed in a case such as this, but without a clearer idea
of what exactly those costs were, the court cannot speculate. Like the illustration
involving the car, the loss here is the fair market value of the meat. The loss does not
include the victim's consequential losses like "dealing with all of the problems associated
with the thefts." Accordingly, the court shall not include the $98,000 in time and
management expenses in its loss calculation.

####    *d.*    *Total loss amount*

In light of the foregoing, the court finds that the amount of loss in this case is approximately $221,001.21, resulting in an increase of **12** levels.  USSG §2B1.1(b)(1)(G).  This brings Defendant's base offense level to **22**.

### B.    Chapter Three, Part B Adjustments: Role in the Offense

### 1.    Aggravating role

USPO scored a **3**-level enhancement for Defendant's role in the offense, pursuant to USSG §3B1.1(b), which calls for the enhancement if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive[.]"  The government urges the court to apply a **4**-level enhancement pursuant to USSG §3B1.1(a), which calls for the adjustment if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]"  Defendant argues that no role enhancement applies.

The commentary provides the following guidance to distinguish organizers and leaders from managers or supervisors:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.  Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.  This adjustment does not apply to a defendant who merely suggests committing the offense.

USSG §3B1.1, cmt. (n.4).

The court finds that USPO correctly scored the **3**-level enhancement. The government concedes that whether to apply the **4**-level enhancement is a "close call." Gov't. Sent. Mem. at 25. The **4**-level enhancement applied to James Patterson, as he had the highest "degree of participation in planning or organizing the offense." USSG §3B1.1, cmt. (n.4). Although Defendant did not exercise that kind of authority, he directed his son to buy meat from the Pattersons while he was away in Texas and provided his son with a list of his customers. Further, Beidler testified that Defendant told him to "keep his mouth shut" if questioned by law enforcement. Defendant set the price to charge his customers for the meat. Additionally, he received a large share of the "fruits of the crime"—two-thirds of the meat.

Furthermore, the criminal conduct involved five or more participants. A "participant" is "a person who is criminally responsible for the commission of the offense." *United States v. Brockman*, 183 F.3d 891, 299 (8th Cir. 1999) (quoting USSG §3B1.1, cmt. (n.1)). "Persons who are not indicted or tried, but who are nonetheless criminally responsible for [a] defendant's crime, are 'participants.'" *Id.* Here, "participants" in the crime include, *at least*, James and Patricia Patterson and their two minor daughters as well as Lloyd Patterson and Defendant. Even if the criminal activity did not involve five or more participants, the court finds that it was "otherwise extensive." USSG §3B1.1(a). Defendant testified as much as trial, admitting that he sold meat to "half of Dubuque." Transcript (docket no. 57) at 44. Further, other persons directly involved in the stolen meat sales were Defendant's wife, Jaunita; his son, Donald Herbst, Jr.; and his son-in-law, Doug Beidler.

At the Hearing, Defendant argued that his customers were not "participants" and that, therefore, the enhancement should not apply. Defendant seems to be arguing that, in order for the role enhancement to apply, Defendant must have supervised other participants of the criminal activity and not just his customers or other non-participants.

The plain language of the enhancement does not make this distinction. "The enhancement 'flows from the defendant's decision-making authority, type of participation in the offense, nature and scope of the crime, and the degree of control or authority over *others*.'" *United States v. Pizano*, 421 F.3d 707, 733 (8th Cir. 2005) (quoting *United States v. Noe*, 411 F.3d 878, 889 (8th Cir. 2005)) (emphasis added). "Furthermore, the enhancement applies 'even if the defendant's leadership role did not encompass all the participants.'" *Id.* (quoting *United States v. Payne*, 119 F.3d 637, 646 (8th Cir. 1997)). Here, Defendant exercised a significant "degree of control or authority over others." *Pizano*, 421 F.3d at 733. Whether or not these others were technical participants is irrelevant to the court's analysis. Examples of the persons instructed to perform certain acts in furtherance of the stolen meat sales were Juanita Herbst, Donald Herbst, Jr. and Doug Beidler. Defendant directed Juanita Herbst how much to pay the Pattersons for the stolen meat. Defendant instructed his son to purchase the stolen meat while Defendant was out of town and furnished his son with the cash to complete the deal. Defendant also gave his son a list of customers to whom the meat should be delivered. Defendant determined how much to purchase and of course financially benefitted by keeping all the profit. Accordingly, the court shall apply a **3**-level enhancement for role in the offense. This brings Defendant's base offense level to **25**.

## 2. *Use of a minor*

The government objects to USPO's decision not to score a **2**-level enhancement for use of a minor to commit the offense, pursuant to USSG §3B1.4. The government argues that Defendant used the Pattersons' minor daughters in the offense, as the minor daughters often helped their parents deliver meat to Defendant.

"A sentencing court should increase a defendant's offense level by two levels if the defendant 'used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense.'" *United States*

*v. Jones*, 612 F.3d 1040, 1048 (8th Cir. 2010) (quoting USSG §3B1.4). "The commentary states that 'used or attempted to use' includes directing, commanding, encouraging, intimidating, recruiting or soliciting." *Id.* "A defendant must 'affirmatively involve or incorporate the minor into the commission of the offense.'" *Id.* (quoting *United States v. Mentzos*, 462 F.3d 830, 841 (8th Cir. 2006)).

The court finds that the **2**-level enhancement for use of a minor does not apply. Defendant did not take affirmative steps to involve the Pattersons' daughters in the offense. He did not call them to request meat or otherwise communicate with them to arrange any meetings. The Pattersons recruited their daughters and involved them in the offense and the use of a minor enhancement was properly scored in their sentences. Accordingly, the court will not apply the **2**-level adjustment for use of a minor.

### C. Chapter Three, Part C Adjustments: Obstruction

USPO scored a **2**-level adjustment for "obstructing or impeding the administration of justice," pursuant to USSG §3C1.1. Defendant objects to the scoring of the enhancement.

The enhancement applies "if the district court finds by a preponderance of the evidence that 'the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the [offense charged in the Indictment].'" *United States v. Molina*, 172 F.3d 1048, 1058 (8th Cir. 1999) (quoting USSG §3C1.1). "[T]he obstructive conduct must relate to the defendant's offense of conviction and any relevant conduct, or a closely-related offense." *Jones*, 612 F.3d at 1046. Perjury is specifically listed in the Guidelines commentary as an "example[] of covered conduct." USSG §3C1.1, cmt. (n.4(A)).

"'In order to base an obstruction of justice enhancement on a defendants's trial testimony, the district court must find by a preponderance of the evidence that he perjured himself.'" *United States v. Williams*, 557 F.3d 556, 560-61 (8th Cir. 2009) (quoting

*United States v. Lewis*, 436 F.3d 939, 945 (8th Cir. 2006)). "'A district court applying the obstruction-of-justice enhancement for perjury must review the evidence and make an independent finding, by a preponderance of the evidence, that the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Id.* at 61 (quoting *United States v. Ziesman*, 409 F.3d 941, 956 (8th Cir. 2005)).

The government asks the court to rely on numerous incidents of Defendant's conduct to sustain the enhancement. The court will apply the enhancement based on Defendant's testimony at trial. Defendant argues that, because the jury could have convicted him based on the theory that Defendant should have known the meat was stolen, his testimony that he did not know the meat was stolen did not necessarily constitute perjury.

First, the court finds that Defendant knew the meat was stolen and that he lied about this knowledge. Second, putting aside the issue of knowledge, Defendant obstructed justice by making numerous false statements during his testimony, including: (1) that the source and reason for the money in his safe was not for meat sales; (2) that he never told Beidler to "keep his mouth shut"; (3) that Juanita Herbst's bank bag was used to make change at the business; (4) that Butch Maas told him that Patricia Patterson was buying meat for $.50 and selling it for $1.00; (5) that the amount of meat he bought from the Pattersons was anywhere between 8,000 and 15,000 pounds; and (6) that James Patterson initially made contact with him as opposed to Defendant initiating contact with James Patterson. Accordingly, the court shall apply the **2**-level adjustment for obstruction. This brings Defendant's base offense level to **27**.

### D. Chapter Three, Part E Adjustments: Acceptance of Responsibility

USPO did not score a downward adjustment for acceptance of responsibility. Defendant bears the burden to prove that he is entitled to a **2**-level downward adjustment

for accepting responsibility. *See* USSG §3E1.1 (stating that "if the *defendant* clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels"(emphasis added)). Defendant argues that he is entitled to the adjustment, because the jury likely convicted him based on the theory that he should have known the meat was stolen and that he has never denied buying the meat from the Pattersons.

"If the defendant clearly demonstrates acceptance of responsibility for his offense," the court should "decrease the offense level by **2** levels." USSG §3E1.1.

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations, a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

USSG §3E1.1, cmt (n.2).

In the instant case, Defendant required the prosecutor to take the case to trial. The sole issue before the jury was whether Defendant knew or should have known that the meat he and co-conspirators bought, possessed or sold was stolen. Even a cursory read of the trial transcript demonstrates that Defendant was not limiting the trial to preserving a constitutional or statutory challenge. *See* USSG §3E1.1, cmt (n.2). Defendant contested the prosecutor's evidence, cross-examined prosecution witnesses, introduced evidence and testified on his own behalf. The **2**-level reduction for acceptance of responsibility is "not

intended to apply to a defendant who puts the government to its burden of proof by denying factual elements of guilt." *United States v. Smith*, 40 F.3d 933, 35-36 (8th Cir. 1994).

Further, only in extraordinary cases is a defendant entitled to acceptance of responsibility after the court finds he has obstructed justice. *United States v. Honken*, 184 F.3d 961, 968 (8th Cir. 1999). None of the factors which would constitute such an extraordinary case are present in the case at bar.

In any event, Defendant, even as late as the Hearing, failed to demonstrate acceptance of responsibility and true remorse for his criminal behavior, although he was clearly sorry that he had been caught, prosecuted and required to make financial amends. *See, e.g. Unites States v. Ervasti*, 201 F.3d 1029, 1043-44 (8th Cir. 2000) (holding district court did not clearly err in denying acceptance of responsibility to a defendant who repeatedly denied intent to defraud).

For all the above reasons, the court finds that Defendant has failed to carry his burden to prove he is entitled to the **2**-level reduction for acceptance of responsibility.

### E. Pre-Departure/Variance Advisory Guidelines

Prior to the application of any departure or variance, Defendant is **Criminal History Category I** with a total adjusted offense level of **27**. His advisory Sentencing Guidelines range is **70-87 months of imprisonment**. *See* USSG Sentencing Table.

## VII. DEPARTURES

The government argues that an upward departure may be appropriate pursuant to USSG §5K2.0, which allows for departures to account for circumstances not adequately addressed by the advisory Guidelines range. Specifically, the government argues that the

Guidelines do not account for Defendant's "extraordinary efforts to obstruct justice." Gov't. Sent. Mem. at 39.[7]

In discussing the propriety of Chapter 5 departures generally, the Eighth Circuit Court of Appeals stated:

> Departures are appropriate if the sentencing court finds that there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." USSG §5K2.0. The guidelines provide that sentencing courts [are] to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, a court may consider whether a departure is warranted. USSG §1A1.1, cmt. n.4(b).

*United States v. Chase*, 451 F.3d 474, 482 (8th Cir. 2006) (formatting altered).

The decision whether to depart from the advisory Sentencing Guidelines rests within the sound discretion of the district court. *See, e.g., United States v. Thin Elk*, 321 F.3d 704, 707-08 (8th Cir. 2003) (reviewing for an abuse of discretion "because the decision to depart embodies the traditional exercise of discretion by the sentencing court") (citations and internal quotation marks omitted). However, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland

---

[7] The government also argues that an upward departure pursuant to USSG §3B1.4, cmt. (n.3) may be appropriate. The commentary to USSG §3B1.4 states that "[i]f the defendant used or attempted to use more than one person less than eighteen years of age, an upward departure may be warranted." Because the court has found that Defendant did not "use" the minors as defined by the Guidelines, it will not consider this basis for an upward departure. However, the court will consider the fact that minors were involved in the offense in its ultimate decision on disposition.

of cases[.]" *Koon v. United States*, 518 U.S. 81, 98 (1996). The district court must "carefully articulate the reasons for departure, particularly where the waters are unchartered." *United States v. Reinke*, 283 F.3d 918, 925-26 (8th Cir. 2002).

"The district court is not left adrift [. . .] in determining which cases fall within and which cases fall outside of the 'heartland.'" *United States v. McCart*, 377 F.3d 874, 877 (8th Cir. 2004) (citing *Koon*, 518 U.S. at 94). In USSG §5K2.1, *et seq.*, "[t]he Sentencing Commission enumerated some of the factors that it believed were not adequately accounted for in the formulation of the Guidelines and might merit consideration as aggravating or mitigating circumstances." *Thin Elk*, 321 F.3d at 708 (citing USSG §5K2.0).

The court agrees that Defendant's conduct was significantly obstructive. Although an upward departure would be permitted under USSG §5K2.0(a)(3) and §5K2.21, the court declines to depart upward because a sentence within the computed Guidelines range is sufficient to satisfy the goals of sentencing. However, the court will consider the facts underlying the potential upward departure in conjunction with its analysis of the factors enumerated in 18 U.S.C. § 3553(a).

## VIII. VARIANCES

The government requests an upward variance for the same reasons it asserts a departure is appropriate. Defendant requests a downward variance based upon all the factors at 18 U.S.C. § 3553(a).

Post-*Booker*, the court must determine whether a non-Guidelines sentence is appropriate after determining the Guidelines range and any permissible departures within the Guidelines structure. *United States v. Myers*, 503 F.3d 676, 684 (8th Cir. 2007). The court has a "responsibility to select a sentence that [is] 'sufficient, but not greater than necessary' to comply with the statutory sentencing purposes." *United States v. Gray*, 577 F.3d 947, 950 (8th Cir. 2009) (quoting 18 U.S.C. § 3553(a)); *see also United States v.*

*Butler*, 594 F.3d 955, 967 (8th Cir. 2010) (same). "[A] district court's job is not to impose a reasonable sentence, but rather to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a). *United States v. Lytle*, 336 F. App'x 587, 588 (8th Cir. 2009) (citations and internal quotation marks omitted). In analyzing a motion for a downward variance, a "district court has wide discretion to weigh the factors in each case and assign some factors greater weight than others[.]" *United States v. Kane*, 552 F.3d 748, 755 (8th Cir. 2009) (citation omitted).

Defendant argues that a sentence of a year and one day is a sufficient sentence, not greater than necessary to achieve the goals of sentencing. The court has carefully considered Defendant's arguments.

Defendant's family and friends wrote letters to the court praising Defendant for his business acumen, generosity and honesty. As noted by the prosecutor, some of those who wrote the letters bought stolen meat from Defendant. The writers argue that, because of these traits, Defendant should not go to prison. Several dispute the jury's verdicts. Very few of the writers attended the trial. Understandably, they do not comprehend the seriousness of Defendant's criminal acts. They also did not hear the evidence that convinced the court that Defendant attempted to obstruct law enforcement's investigation and that Defendant lied under oath in an attempt to escape conviction.

During his colloquy, Defendant argued that he should receive a reduced prison term, because he paid over $500,000 relative to the stolen meat in the civil and criminal cases. It is true that Defendant paid $175,318.68 in restitution. Defendant only paid the restitution after the jury found him guilty of ten crimes. This court would have ordered that he pay full restitution pursuant to 18 U.S.C. § 3663A(c)(1) and the restitution would have been collectable from Defendant's assets of over $6,000,000. Therefore, this payment was hardly voluntary. Nevertheless, the restitution paid will assist the victims in recovering from the criminal acts that occurred in 2006 and 2007. It should be noted that

the other co-conspirators also paid on the joint restitution obligation, and in addition, forfeited significant assets to the United States.

Defendant's sentence will be different from those of the co-conspirators, because the Pattersons pled guilty, demonstrated remorse and did not receive an obstruction of justice enhancement for testifying falsely under oath. Had Defendant done the same as the Pattersons, his advisory Guidelines range would have been 41 to 51 months (Base Offense Level 22, Criminal History Category I). In addition, the Pattersons came forward and testified at trial. For those reasons, the sentences for the Pattersons will be lower than the sentence imposed on Defendant.

There are aggravating factors that the court could use to give a top of the Guidelines sentence or to depart or vary upward, not the least of which is the non-monetary loss to the victim McFarland. As a result of Defendant's criminal conduct and the criminal conduct of the Pattersons, McFarland has lost good will with its customers who now question McFarland's ability to haul their loads. In addition, Geoff Baker and other employees of the company, have been so consumed with the thefts, lawsuits and customer concerns that they have been unable to devote the time necessary to perform work that would enhance their future business growth. In an era of fierce business competition, it is not possible to put a dollar figure on this loss.

Another aggravating factor that could support a top of the Guidelines sentence or an upward variance or departure is the widespread obstructive conduct of Defendant during the investigation and prosecution of this case, which was not taken into consideration in scoring the obstruction of justice enhancement under §3C1.1. On so many issues, Defendant has never told the same story twice. Defendant is simply not worthy of belief.

In arriving at a sentence, the court carefully considered all of the statutory factors set forth in 18 U.S.C. § 3553(a). Having done so, the court finds that a sentence within the computed advisory Guidelines range is firmly rooted in credible evidence produced at

trial and at the Hearing and contained in the uncontested portions of the PSIR. Accordingly, the court declines to vary from the advisory Guidelines range.

## IX. FINE

Next, the court considers whether to impose a fine on Defendant. "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG §5E1.2(a). Here, Defendant has significant assets and has not shown that he is unable to pay a fine. To determine the appropriate amount of the fine, the court must consider, and the court has considered, eight factors:

> (1) the need for the combined sentence to reflect the seriousness of the offense; (2) any evidence presented as to the defendant's ability to pay the fine . . . in light of his earning capacity and financial resources; (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments; (4) any restitution or reparation that the defendant has made or has an obligation to make; (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct; (6) whether the defendant has been fined for a similar offense; (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and (8) any other pertinent equitable considerations.

*United States v. Allmon*, 500 F.3d 800, 807 n.3 (8th Cir. 2007) (quoting USSG §5E1.2(d)). The advisory Guidelines range reflects the seriousness of Defendant's criminal conduct. A combination of imprisonment and a fine is appropriate. Defendant has the ability to pay a fine without placing an undue burden on his wife. Defendant has assets of over $6,000,000. In addition, he had his wife have an income stream from their businesses and investments. Incarceration and supervision of Defendant will be costly to the government and Defendant can pay a portion of that cost. Defendant has already paid restitution and a settlement in the related civil case. Accordingly, the court finds that a

fine at the low end of the advisory Guidelines range, or $10,000, will satisfy the goals of sentencing.

## X.  CONCLUSION

In light of the foregoing, the court finds that the appropriate sentence is **70 months of imprisonment**, followed by **2 years of supervised release**.  Defendant is ordered to pay a fine of **$10,000**.  When the court reconvenes the Hearing on **March 2, 2011**, it shall sentence Defendant in a manner consistent with the instant Sentencing Memorandum.

**IT IS SO ORDERED.**

**DATED** this 1st day of March, 2011.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA